**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
JOSE AGUILAR, PRIMITIVO AGUILAR, JOAQUIN
ALMAZAN, ALBERTO BARRANCO, RAMIRO
CASA, JOAQUIN CORONA, HUGO FLORES,
JAVIER FLORES, VOON ONN, JORGE OREA,
AGUSTIN RAMALES, ANGEL ZAMBRANO, and          **REPORT**
JUN ZHAO,                                     **& RECOMMENDATION**

          Plaintiffs,                          06-CV-6790 (SLT) (RER)

    - against -

E-Z SUPPLY CORP., SUNRISE PLUS CORP., and
LESTER WEN,

          Defendants.
-----------------------------------------------------------------X
SUNRISE PLUS CORP.,

          Counterclaim Plaintiff
          /Third Party Plaintiff

    - against -

JOSE AGUILAR, PRIMITIVO AGUILAR, JOAQUIN
ALMAZAN, ALBERTO BARRANCO, RAMIRO
CASA, JOAQUIN CORONA, HUGO FLORES,
JAVIER FLORES, VOON ONN, JORGE OREA,
AGUSTIN RAMALES, ANGEL ZAMBRANO, and
JUN ZHAO,

          Counterclaim Defendants,

    - and -

BILLY J. RANDEL and INDUSTRIAL WORKERS
OF THE WORLD (IWW),

          Third Party Defendants.
-----------------------------------------------------------------X

**RAMON E. REYES, JR., U.S.M.J.:**

The above-named individual plaintiffs (collectively "plaintiffs") filed this action against defendants E-Z Supply Corp. ("E-Z Supply"), Sunrise Plus Corp. ("Sunrise" or "defendant") and Lester Wen ("Wen") under the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. § 201 *et seq.*, and New York Labor Law § 190 *et seq.* (McKinney 2008). (Docket Entry 1.)  Plaintiffs allege that they were not properly compensated while employed by E-Z Supply and seek unpaid overtime wages and liquidated damages. (*Id*. ¶¶ 24-29.)

Previously, a default judgment in the amount of $1,068,800 was entered against E-Z Supply in light of its failure to answer the complaint. (Docket Entries 45, 48.)  On July 15, 2008, plaintiffs filed this summary judgment motion against Sunrise, arguing that Sunrise is the alter ego of E-Z Supply, and is therefore bound by the default judgment. (Docket Entries 52-62, 66-67.)  In so arguing, plaintiffs rely upon a March 3, 2008 Order of the National Labor Relations Board in a related matter (the "NLRB Order"), in which it was held that Sunrise is the alter ego of E-Z Supply.  Plaintiffs also seek summary judgment on, or dismissal for lack of jurisdiction over, Sunrise's  counterclaims.[1] Sunrise and Wen oppose plaintiffs' summary judgment motion. (Docket Entries 63-65.)  The Honorable Sandra L. Townes referred plaintiffs' summary judgment motion to me for a Report and Recommendation. (Docket Entry 68.)  For the reasons stated herein, I respectfully recommend that plaintiffs' motion be granted in part and denied in part.

---

[1]   Third party defendants Billy J. Randel and Industrial Workers of the World did not join in this Motion for Summary Judgment, nor have they made an appearance in this action.  Counsel for Sunrise claims to have served them with a copy of his Answer and Third Party Complaint. (Docket Entry 5.)  Unfortunately, given the conduct of defense counsel in this litigation and before the NLRB, the Court is forced to question such service.

## BACKGROUND

Plaintiffs are thirteen drivers, forklift operators and warehouse helpers that were formerly employed by E-Z Supply.  E-Z Supply was a restaurant supply firm that was family owned and operated.  In or about November 2006, there was some sort of transaction in which Sunrise purportedly "purchased certain assets" of E-Z Supply.  Shortly thereafter, E-Z Supply was dissolved.  The record strongly indicates that this sale is merely a transparent attempt by the shareholders of E-Z Supply to escape liability in this, and other matters.

Prior to the sale of its assets to Sunrise, in November 2005, a number of E-Z Supply's employees attended a meeting at a community organization known as "Make the Road by Walking."  At this meeting the employees discussed E-Z Supply's purported violations of wage and hour laws, and they were directed to a union agent for assistance in pursuing their rights.  On February 23, 2006 a union, third party defendant Industrial Workers of the World ("IWW" or "Union"), was certified as the collective bargaining representative of the employees of E-Z Supply.  Following the issuance of certification, IWW and E-Z Supply engaged in bargaining for an initial contract.  Throughout this process, E-Z Supply and Sunrise engaged in conduct that appeared to violated the National Labor Relations Act.

Defendants' conduct during these negotiations prompted a complaint to be filed with the National Labor Relations Board ("NLRB") alleging that E-Z Supply and Sunrise had engaged in unfair labor practices.  On December 28, 2007, an administrative law judge ("ALJ") issued a decision finding that E-Z Supply and Sunrise engaged in unfair labor practices in violation of section 8 of the National Labor Relations Act.  One of the conclusions of law necessary to the ALJ's decision was that Sunrise is the alter ego of E-Z Supply.  The alter ego conclusion was based on the following findings of fact:

3

The management and supervision of Sunrise Plus is substantially identical with that of E-Z Supply.  Lester Wen is identified as the general manager and sales manager of both companies with the responsibility for the day to day operation of the warehouse.   Lester Wen was the chief management representative at negotiations with the Union for E-Z Supply and he continued in that role after the name of the company was changed to Sunrise Plus. Eva Ma, the boss of E-Z Supply continued to work for Sunrise Plus in a supervisory capacity.  Florence Wen is a supervisor of both E-Z Supply and Sunrise Plus.  "Danny" Can Hong Liu is the warehouse supervisor for Sunrise Plus, continuing the job position and duties he exercised at E-Z Supply.

         . . . .

       The business purpose, operations, equipment and customers of E-Z Supply and Sunrise Plus are identical.  Both deliver food and restaurant supplies to restaurants from the same warehouse location.  Sunrise Plus purchased the equipment of E-Z Supply and began using it the day after the closing on the sale. Sunrise Plus uses the customer lists of E-Z Supply and kept the same telephone number so that customers could continue to call the warehouse without interruption to place their orders.  The employees testified that they continued to deliver to the same restaurants after the company became Sunrise Plus.

         . . . .

       . . . [T]he ownership of E-Z Supply and Sunrise Plus is substantially identical.  Although Eva Ma was identified as the boss of E-Z Supply, Lester Wen's affidavit states that there [were] four shareholders of E-Z Supply.  The E-Z Supply bank statement reveals that after the sale of its assets to Sunrise Plus it had a balance of $93,657.96 and that this total sum was paid in equal parts to Lester Wen, Eva Ma, Ellen Wen and Florence Wen. . . . Thus, I am justified in coming to the obvious conclusion, in the absence of any other explanation, that the four-way liquidation of the remaining assets of E-Z Supply was a distribution to the four shareholders of E-Z supply.  I find that Lester Wen, Eva Ma, Ellen Wen and Florence Wen were the four shareholders of E-Z Supply.  Ellen Wen testified that she is the sole shareholder of Sunrise Plus.  However, her testimony shows that she borrowed money from Lester Wen, Eva Ma and Florence Wen to finance her purchase of the E-Z Supply assets for Sunrise Plus.  According to Ellen Wen there are no documents showing the existence or amount of these loans nor requiring any repayment.  Ellen Wen has not made any payments on these loans. In the absence of any documentation or further explanation it would seem that the so-called loans are a sham and that Lester Wen, Eva Ma and Florence Wen have an ownership interest in Sunrise Plus.

(Docket Entry 61, Ex. A at 15-17.)

4

On March 3, 2008, the ALJ's decision was adopted by the NLRB, Sunrise having filed no appeal thereto. (Docket Entry 61, Ex. A.)  On June 26, 2008, the United States Court of Appeals for the Second Circuit issued a judgment enforcing the NLRB Order that E-Z Supply and Sunrise are alter egos. (Docket Entry 66, Ex. A.)

Plaintiffs commenced this action against E-Z Supply, Sunrise and Lester Wen on December 28, 2006, alleging that they were improperly compensated while employed by E-Z Supply, and seeking unpaid overtime pay and liquidated damages.  In light of E-Z Supply's failure to answer the complaint or otherwise defend this action, on March 31, 2008, Judge Townes issued an Order directing the Clerk of the Court to enter judgment against E-Z Supply.

## **DISCUSSION**

I.    Applicable Legal Standards

    A.    Summary Judgment

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981).  In addition, the court must resolve all ambiguities and draw all reasonable inferences in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If, however, the opposing party fails to make a showing of an essential element of its case for which it bears the burden of proof, summary judgment will be granted. *Celotex*, 477 U.S. at 323; *Smith v. Half Hollow Hill Cent. Sch. Dist.*, 349 F. Supp. 2d 521, 524 (E.D.N.Y 2004).

To overcome a motion for summary judgment, the opposing party must show that there is an issue of material fact that is in dispute.  That is, the disputed fact must be one which "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  If the opposing party does not set forth specific facts showing that there is a genuine issue for trial, summary judgment is appropriate. FED. R. CIV. P. 56(c).

B.      Collateral Estoppel

The law recognizes two forms of preclusion: claim preclusion, or *res judicata*; and issue preclusion, or collateral estoppel.  In *Allen v. McCurry*, the Supreme Court explained the difference between the two in the following manner:

> Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.

449 U.S. 90, 94 (1980).  These doctrines "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id.* Here, plaintiffs argue that in light of the NLRB Order, Sunrise is collaterally estopped from litigating the factual and legal issues involved in the determination of whether it is E-Z Supply's alter ego.

Under the collateral estoppel doctrine, "a judgment in a prior proceeding bars a party and its privies from relitigating a factual or legal issue if, but only if: (1) the issues in both proceedings are identical; (2) the issue in the prior proceeding was actually litigated and actually decided; (3) there was full and fair opportunity to litigate in the prior proceeding; and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *N.L.R.B. v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999).

6

II.     Sunrise Should Be Precluded From Litigating the Alter Ego Issue

        Plaintiffs argue that Sunrise should be precluded from litigating the factual and legal

issues involved in determining whether it is the alter ego of E-Z Supply. (Docket Entry 62.)

Defendant, however, contends that it is not collaterally estopped from relitigating the issue of

alter ego because (1) the former adjudication was before an ALJ; (2) if collateral estoppel applies

to the issue of alter ego, the plaintiffs should be barred from bringing the present motion by *res

judicata*; (3) the collateral estoppel effect of prior NLRB adjudications are limited to

"subsequent [Labor Management Relations Act] section 303 damage actions"; and (4) the NLRB

proceedings dealt with a totally unrelated set of issues. (Docket Entry 64.)  Defendant's

contentions, however, are incorrect.

        A.      Collateral Estoppel Should Apply Even Though It Was an ALJ Ruling

        No authority supports defendant's contention that collateral estoppel effect should be

denied merely because the prior proceeding was before an ALJ.  Contrary to defendant's

assertion, the Court would not be "abdicat[ing] its functions [or] simply rubberstamp[ing] the

decision of an inferior tribunal" by affording collateral estoppel effect to the NLRB decision.

(Docket Entry 64.)  Instead, when an administrative agency such as the NLRB acts in a judicial

capacity, and resolves disputed issues of fact properly before it which the parties have had an

adequate opportunity to litigate, the board's determination is entitled to *res judicata* and

collateral estoppel effect. *See United States v. Utah Const. and Mining Co.*, 384 U.S. 394, 422

(1966); *Wickham Contracting Co. v. Board of Educ.*, 715 F.2d 21, 26 (2d Cir. 1983)*.  Therefore,

collateral estoppel should not be denied merely because the decision was rendered by an ALJ.

        It is undisputed that the NLRB had jurisdiction over the plaintiffs' unfair labor practice

claims and that the issue of alter ego was properly before the board.  Furthermore, the parties

were afforded an opportunity to fully litigate the issues surrounding the claims in a five-day long

hearing.  Defendant appears to be contesting the competency of the NLRB as a tribunal in

rendering the decision; however, it offers no explanation as to why the NLRB was not a

competent tribunal to resolve the issue of alter ego.  In fact, courts have held the NLRB to be a

competent tribunal. *See Wickham*, 715 F.2d at 26. Therefore, Sunrise should be collaterally

estopped from relitigating the alter ego issue.

      B.     <u>Defendant Incorrectly Applied the Doctrine of Res Judicata</u>

Defendant contends that even if collateral estoppel applies to the NLRB decision, *res*

*judicata* bars plaintiffs from bringing the present action. (Docket Entry 64.)  Defendant fails to

appreciate the difference between *res judicata* and collateral estoppel.  *Res judicata* functions as

*claim* preclusion and bars a plaintiff from suing on the same wrong because a judgment for the

plaintiff operates to extinguish and merge all of the plaintiff's claims from that wrong.

Restatement (Second) of Judgments § 17–18 (1982).  Collateral estoppel, however, makes a

determination of an *issue* conclusive on the parties "in subsequent suits based on a different

cause of action involving a party to the prior litigation." *Id.* § 27.

The doctrine of *res judicata* is only applicable if there was a final judgment on the merits,

the two suits involve the same "claim," and the claim raised in the second suit could actually

have been raised in the previous action. *Allen*, 449 U.S. at 94; *Interoceanica Corp. v. Sound*

*Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir. 1997) (citing *Apparel Art Int'l, Inc. v. Amertex Enters. Ltd.*,

48 F.3d 576, 583 (1st Cir. 1995)).  "Whether or not the first judgment will have preclusive effect

depends in part on whether the same transaction or connected series of transactions is at issue,

[and] whether the same evidence is needed to support both claims." *Interoceanica*, 107 F.3d at

90 (internal citation omitted).  To determine whether two actions arose from the same transaction

8

or series of transactions, a court will determine "pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Interoceanica*, 107 F.3d at 90-91 (internal citation omitted).  In the Second Circuit, a claim has the same transaction or series of transaction "where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first." *Interoceanica*, 107 F.3d at 91.

*Res judicata* is not applicable in this case because the two actions did not arise from the same transaction or series of transactions and because the plaintiffs could not have raised the FLSA claims in the first action.  The NLRB action related to defendant's unfair labor practices, whereas the current action relates to defendant's alleged failure to pay statutorily required wages.  The essential facts and elements necessary for the NLRB action were whether defendant interfered with, restrained, or coerced employees in the exercise of their rights to participate in union activities. 29 U.S.C. § 158(1), (3), (5).  On the other hand, the current case asks whether defendant complied with the FLSA by paying the statutory minimum and overtime wage, and whether the defendant violated the FLSA's anti-retaliation provisions. 29 U.S.C. §§ 206, 207, 215(a)(3); (Docket Entry 1).  Not only do these claims require the plaintiffs to prove entirely different sets of facts, but they also raise entirely different sets of legal issues.  Furthermore, the NLRB's power is limited to the prevention of unfair labor practices listed in 29 U.S.C. §158.  Thus, an FLSA claim would be outside its jurisdiction. 29 U.S.C. §§ 160.  Because plaintiffs' claims do not arise from the same transaction or series of transactions, and the plaintiffs could not have raised the FLSA claim in the NLRB proceeding, the principle of *res judicata* is not applicable.

9

In contrast, and as discussed above, plaintiffs' collateral estoppel argument does not have the same requirements. Therefore, defendant's contention that if it is collaterally estopped from relitigating the alter ego issue, then the plaintiffs should also be barred by *res judicata* is incorrect.

C.     Collateral Estoppel Effect for NLRB Determination is Not Limited to §303 Damage Actions

Relying on *Wickham*, defendant contends that the Second Circuit has limited the collateral estoppel effect of NLRB decisions exclusively to subsequent section 303 damage actions.  (Docket Entry 64, at 10-11.)  In *Wickham*, the Circuit applied the doctrine of collateral estoppel issues in a subsequent section 303 claim, yet declined to apply it to a related antitrust claim.  715 F.2d at 21.  The distinction which defendant draws, however, does not hold up to even minimal scrutiny.

In *Wickham* itself, the Second Circuit noted that "relitigation of issues adjudicated by the NLRB is precluded . . . by the doctrine of collateral estoppel to the extent the issues are . . . essential to the NLRB's decision.  *Id.* at 27.  Rather than declining to apply collateral estoppel because it is somehow limited only to section 303 damages actions, the Circuit specifically found that collateral estoppel was not applicable to the issues in the antitrust action because those issues were "neither necessary nor essential to the unfair labor practice findings" in the NLRB's decision.  *Id.* at 28.  Here, the alter ego issues were necessary and essential to the NLRB's unfair labor practice findings, thus their collateral estoppel effect can apply to more than subsequent section 303 damage actions.

Moreover, the Second Circuit has also explicitly held in other cases that NLRB decisions are not to be denied collateral estoppel effect merely because a subsequent action is based on a

10

different statute.  *Frye*, 767 F.2d 1220.  "[I]t is not the similarity between the types of litigation or actions involved but between the factual issues and their roles in the respective actions that is important."  Id.  Therefore, the collateral estoppel effect of NLRB decisions is not limited to subsequent section 303 actions and the Court should afford the NLRB decision collateral estoppel effect in this matter to the extent applicable.

D.      The Doctrine of Collateral Estoppel is Applicable to the Issue of Alter Ego

In order to determine whether collateral estoppel effect should be given to an ALJ decision, the Court must find that: (1) the disputed issues are the same; (2) the agency acted in a judicial capacity; (3) the previous action was properly before the agency; (4) the parties had an adequate opportunity to litigate the issues; (5) the issues were actually litigated and decided; and (6) the issue previously litigated was necessary to support a valid and final judgment on the merits. *Frye*, 767 F.2d at 1220; *Thalbo Corp.*, 171 F.3d at 109.

As an initial matter, I note that neither party disputes the fact that the NLRB was acting in a judicial capacity, that the action was properly before the agency, that there was an adequate opportunity to litigate the issues, that the issue was actually litigated or that the issue was necessary to support a valid and final judgment on the merits. Nonetheless, for the sake of completeness, the record does indicate that the NLRB was acting in a judicial capacity and that the issue of alter ego was properly before it. (Docket Entry 61 Ex. A.)  Furthermore, the record shows that Sunrise fully litigated the issues in a five day long hearing where the defendant was represented by counsel. *Id.*  The NLRB decision also shows that the issue was decided and was necessary for a judgment on the merits. *Id.*  The only issue in dispute is whether the issues in dispute are the same.

11

Contrary to Sunrise's arguments, the factual and legal issues involved in the alter ego determination in this Court and the NLRB proceeding are identical. (Docket Entry 64 at 9 (arguing that the NLRB proceeding "dealt with a totally unrelated set of issues . . . .").)  The NLRB described the legal standard for determining alter ego status as follows, "[T]he Board will find alter ego status where two entities have 'substantially identical' management, business purpose, operations, equipment, customers, supervision and ownership." (Docket Entry 61, Ex. A. at 15.)  In the Second Circuit, the alter ego inquiry "focuses on commonality of (I) management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi) supervision and ownership." *Newspaper Guild of N.Y. v. NLRB*, 261 F.3d 291, 294 (2d Cir. 2001).  While the underlying legal claims in the NLRB proceedings may have been different than they are here, (*e.g.* Labor Management Relations Act claims v. FLSA claims), precisely the same legal standard and pertinent facts on the *alter ego issue* apply in both the NLRB and this case.

Accordingly, since all of the requirements for the application of collateral estoppel have been met, the Court should preclude the defendant from relitigating the issue of alter ego.

Lastly and perhaps most importantly, Sunrise completely ignores the fact that the Court of Appeals for the Second Circuit has already addressed the Sunrise/E-Z Supply alter ego issue. In April 2008, the NLRB sought enforcement of the NLRB Order pursuant to 29 U.S.C. §§ 151 and 160(e).  Sunrise and E-Z Supply opposed the NLRB's enforcement of the NLRB Order, specifically arguing that Sunrise and E-Z Supply were not alter egos.  The Second Circuit rejected Sunrise's and E-Z Supply's argument, and on June 28, 2008 ordered that Sunrise and E-Z Supply were both bound by the NLRB Order. (Docket Entry 66, Ex. A.)  The Second Circuit's judgment enforcing the NLRB Order is an explicit affirmance of the NLRB's finding that

12

Sunrise is the alter ego of E-Z Supply.  Therefore, this Court lacks the power to decide the issue any differently. (Docket Entry 66 Ex. A.)

III.     Defendant Should Not Be Held Liable for E-Z Supply's Default Judgment

Since Sunrise and E-Z Supply are alter egos of each other, whether by collateral estoppel or by the Second Circuit's ruling, the question then becomes: to what extent is a corporation liable for a default judgment against its alter ego when it has sat idly by and allowed the default judgment to be entered.  In regard to this issue, neither party has cited any controlling or instructive precedent, nor is the Court aware of any.  For the reasons set forth below, I recommend that Sunrise not be held liable for E-Z Supply's default judgment.

A corporation is directly liable for the obligations of its alter ego because they are the same entity.  *Bd. of Trs., Sheet Metal Workers, Nat'l Pension Fund v. Elite Erectors, Inc*., 212 F.3d 1031, 1038 (7th Cir. 2000).  Where "an employer [is] found to be the alter ego of another[, it] is *automatically* responsible for the other's legal and contractual obligations under . . . labor laws." *Newspaper Guild of N.Y. Local No. 3 v. NLRB*, 261 F.3d 291, 298-99 (2d Cir. 2001).

Furthermore, both sides agree that an entity could be held derivatively liable where there is a showing of alter ego, successorship or single employer status. (Docket Entries 62, 64.); *see also Associated General Contractors, Inc. v. NLRB*, 929 F.2d 910 (2d Cir. 1991).  However, Sunrise argues that "[w]hen applied to corporations in [l]abor and employment law, [alter ego] is said to mean two entities having a single employer status or successorship." (Docket Entry 64.) This assertion is blatantly incorrect.  Alter ego status is not the same as single employer status or successorship status but rather is an alternative ground of imposing derivative liability. *See Associated General Contractors*, 929 F.2d at 914.  Citing the Second Circuit's decision in *Viking v. N.L.R.B.*, 225 F.3d 131, as authority, defendant further argues that derivative liability is only

13

allowed when there is a showing of single employer status; however, even in *Viking*, the Second

Circuit explicitly stated that derivative liability could be imposed when there is "a showing of

alter ego, successorship or single employer status." *Viking*, 225 F.3d at 134; (Docket Entry 64.)

Thus, *Viking* does not support defendant's theory that derivative liability is limited to a showing

of single employer status.

Since Sunrise is the alter ego of E-Z Supply, Sunrise is jointly and severally liable for

any legal obligation of E-Z Supply.  *See Lihli Fashions Corp., Inc. v. N.L.R.B.*, 80 F.3d 743, 748-

49 (2d Cir. 1996).  Here, the default judgment conclusively established the legal obligations

between E-Z Supply and the plaintiffs.  Because E-Z Supply has a legal obligation to the

plaintiffs, its alter ego, Sunrise, is also responsible for the obligations to the plaintiffs.  However,

due to the fact that this would impute a default judgment to a party that did in fact answer the

complaint in this action, I turn to the question of whether the Court should, in the interest of

justice, vacate the default judgment and allow Sunrise to litigate the case.

Federal courts have a longstanding preference in resolving litigation on the merits. *See*

*Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).  In fact, the Second Circuit has

stated that:

> because defaults are generally disfavored and are reserved for rare occasions,
> when doubt exists as to whether a default should be granted or vacated, the doubt
> should be resolved in favor of the defaulting party. In other words, "good cause"
> and the criteria of the Rule 60(b) set aside should be construed generously.

*Enron*, 10 F.3d at 96.  However, the reluctance in resolving disputes by default must be balanced

with the underlying policies of default entries and default judgments. *See Davis*, 713 F.2d at 912

("Default judgments implicate sharply conflicting policies . . . ."); *Gomes v. Williams*, 420 F.2d

1364, 1366 (10th Cir. 1970) ("[J]udicial preference [for disposition on the merits] is

14

counterbalanced by considerations of social goals, justice and expediency.")  Entries of default and default judgments play an important role in ensuring speedy determination of litigation, enforcing compliance with the rules of procedure and offering a "remedy to a good faith litigant who is confronted by an obstructionist adversary." 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2693 (3d ed. 2008).

In balancing these competing policies, a court's ultimate responsibility is to do justice between the parties. *Gill v. Stolow*, 240 F.2d 669, 670 (2d Cir. 1957).  General principles, such as speedy resolution of disputes and compliance with procedural rules, will not justify a denial of a party's day in court. *Id.*  However, where the default is willful or the party did not participate in the proceeding in good faith, the drastic remedy of default judgment may be warranted.  *Id.*

The Federal Rules of Civil Procedure provide a method for obtaining relief from both entries of default and default judgments. FED. R. CIV. P. 55, 60.  In the case of default judgment, Rule 60(b) provides alternative reasons for vacatur.  Here, the only applicable grounds are Rule 60(b)(1), "mistake, inadvertence, surprise, or excusable neglect," and Rule 60(b)(6), "any other reason that justifies relief." FED. R. CIV. P. 60.  The Second Circuit in applying Rule 60(b)(1) looks to (1) whether the default was willful; (2) whether defendant has a meritorious defense; and (3) the level of prejudice that may occur to the non-defaulting party if relief is granted. *Davis*, 713 F.2d at 915.  In contrast, the Supreme Court has held that Rule 60(b)(6) vests a court with the power to vacate judgments whenever such action is appropriate to accomplish justice for reasons other than the five reasons provided for in the Rule. *Klapprott v. United States*, 335 U.S. 601, 614–15 (1949); *see also United States v. Karahalias*, 205 F.2d 331 (2d Cir. 1953).

15

A.      E-Z Supply's Default Was Willful

In determining willfulness, courts consider whether the default was due to careless or negligent error, or whether the default was due to a deliberate act. *Gucci America, Inc. v. Gold Center Jewelry*, 158 F.3d 631, 635 (2d Cir. 1998); *American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996). While bad faith would support a finding of willfulness, a showing of bad faith is not a necessary predicate for finding willfulness. *Gucci*, 158 F.3d at 635. Furthermore, in *American Alliance* the Second Circuit noted that where a party has made a strategic decision to default, they will not be relieved of that choice. 92 F.3d at 61.

Here, E-Z Supply's default was clearly a knowing, willful, and deliberate act aimed at avoiding liability. From the outset of this case Sunrise has attempted to distance itself from E-Z Supply, despite the overwhelming evidence that E-Z Supply and Sunrise were alter egos. For example, in its answer Sunrise affirmatively stated that it did "not respond herein on behalf of E-Z Supply Corporation and no response herein is offered for any allegation(s) made against Defendant E-Z Supply Corp. . . . ." (Docket Entry 5, ¶ 4). Sunrise also contends in its answer that Lester Wen is neither an owner nor shareholder of Sunrise or E-Z Supply.[2] Further, throughout the pretrial proceedings, counsel for Sunrise repeatedly denied any material connection between the two entities, contending that the asset sale from E-Z Supply to Sunrise was an arms-length transaction between two largely unrelated companies. Such contentions are utterly belied by the evidence adduced during the proceedings before the ALJ.

It is unnecessary to reiterate here the ALJ's factual findings establishing that E-Z Supply and Sunrise are alter egos. Suffice it to say, however, that the evidence was overwhelming and it

_____

[2]   Wen's contention that he "was neither an owner nor shareholder of said E-Z Supply Corporation" is flatly contradicted by his own affidavit submitted to the ALJ in which he swears under penalty of perjury that "I am a shareholder of E-Z Supply Corp., and General Manager for, E-Z Supply Corp. . . . ." (Docket Entry 59.)

16

sheds much light on the willfulness of E-Z Supply's default in this case. Both E-Z Supply and

Sunrise shared "substantially identical" management, business purpose, operations, equipment,

customers, supervision and ownership. *See supra*, at 4; (Docket Entry 61, Ex. A at 15-17.)

Moreover, as the ALJ found, it appears that Sunrise was established precisely to evade E-Z

Supply's obligations under the National Labor Relations Act:

> E-Z Supply had been negotiating with the Union for an initial contract. In addition, the union had successfully obtained overtime payments for the employees and it was preparing a wage and hour suit. While the negotiations were going on, managers of E-Z Supply were seeking to undermine support for the Union. The credited testimony establishes that in April 2006 Lester Wen instigated a movement to decertify the Union and obtained the signatures of many employees on a petition repudiating the Union. Lester Wen promised the employees more money, payments in cash to avoid taxes and help in obtaining social security and work permits. . . . Moreover, Lester Wen and his then attorney, Lloyd Somer, assured the Union that the company was changing its name but that the company had not been sold and would not be sold, thus hiding the facts from the employees' representative until they could be presented with a *fait accompli*. As late as December 7, 2006, Lester Wen was assuring his employees that he would sign the contract with the Union. I conclude that when the efforts to decertify the Union failed, the shareholders of E-Z Supply determined to enter into a sham sale to a disguised continuance of the company in order to avoid dealing with the Union.

(Docket Entry 61, Ex. A at 17.) Even though the ALJ had not issued her decision at the time E-

Z Supply defaulted, the facts establishing the corporate defendants' alter ego status existed at

that time, and were known by both Sunrise and Wen. Both Sunrise and Wen hired an attorney to

represent them in this action; the same attorney who represented Sunrise during the asset sale

with E-Z Supply.[3] It would have been a simple matter to have an answer, indeed the same

---

[3]   The ALJ went so far as to imply that counsel for Sunrise was also serving as counsel for E-Z Supply:

> There are other indications that the purported sale of E-Z Supply assets to Sunrise Plus was a sham and that the two companies share a common ownership. Attorney Emengo represented Sunrise Plus on October 10, 2006 when the contract of sale was signed. Attorney Emengo stated on the record that he had never represented E-Z supply and that he was ignorant of its affairs and not in contact with its principals. However, on November 20, 2006 E-Z Supply issued a check to

answer, filed on behalf of E-Z Supply, yet defendants chose not to.  I can only assume that the

choice to let E-Z Supply default was a deliberate, yet ill-conceived attempt to further distance

Sunrise and E-Z Supply, and for Sunrise and Wen to avoid liability under the FLSA.

Sunrise also could have "come clean" about it being E-Z Supply's alter ego during the

briefing on plaintiffs' motion for a default judgment.  Plaintiffs' motion for a default judgment

against E-Z Supply was filed on September 7, 2007, before the ALJ hearing.  (Docket No. 31.)

Of course, E-Z Supply did not file an opposition to that motion.  Sunrise did not either.  On

March 27, 2008, however, Sunrise did file an objection to the undersigned's March 27, 2008

Report recommending that a default judgment be entered against E-Z Supply.  (Docket No. 41).

That objection was filed *after* the ALJ's decision *and* the NLRB's Order, yet Sunrise never once

"owned up" to its alter ego status.  At that point Sunrise and Wen could easily have avoided the

entry of the default judgment against E-Z Supply and proceeded to litigate the merits of this case

simply by formally acknowledging its alter ego status and seeking permission to file an answer

on E-Z Supply's behalf.  Sunrise chose not to, and further delayed the final resolution of this

case.

Based on the above, there should be no question in anyone's mind that E-Z Supply's

default was willful.

B.      Sunrise Has Presented an Arguably Meritorious Defense

To date, although Sunrise and Wen have done everything in their power to avoid

litigating their case on the merits, they have, at least minimally, put forth some evidence that

---

Attorney Emengo.  In the absence of any explanation it is reasonable to assume that
E-Z Supply was making a payment for legal services which purportedly had been
rendered to Sunrise Plus.  This lends further support to the conclusion that the true
owners of both companies are the same.

(Docket Entry 61, Ex. A at 16; Ex. J.)

18

they have a meritorious defense to the action.  In response to the instant motion, and in their

objection to the undersigned's Report recommending entry of a default judgment against E-Z

Supply, Sunrise and Wen have submitted documents establishing the wages earned by the

plaintiffs during the relevant period.  The Court has not had the opportunity to test whether this

evidence conclusively establishes a meritorious defense to plaintiffs' claims.  In order to

establish the existence of a meritorious defense, however, a defendant need not establish the

defense conclusively. *S.E.C. v. McNulty*, 137 F.3d 732, 740 (2d Cir. 1998).  Accordingly, this

factor, however slightly, tips in favor of vacating the default judgment.

C.      Vacatur of the Default Judgment Would Not Be Prejudicial to the Plaintiffs

There is no question that vacating E-Z Supply's default judgment would prejudice

plaintiffs in the sense of delaying final judgment.  Delay in reaching a final judgment, however,

is not enough. *Davis*, 713 F.2d at 916.  Rather, the delay must materially prejudice the plaintiff's

ability to effectively prosecute its case. *Id.* (delay must result in the loss of evidence, create

increased difficulties of discovery, or provide greater opportunity for fraud and collusion).  Here,

no such prejudice appears on the record.

Vacating the default judgment would also prejudice plaintiffs to the extent of the time,

effort and attorney's fees they expended in moving for default.  Such prejudice, however, is not

enough in my mind to deny vacating the default judgment.  The costs associated with moving for

default can and should be assessed against defendants and their counsel as a consequence for

vacating E-Z Supply's default, whether or not plaintiffs are ultimately successful in this case.

*See, e.g., Richardson v. Nassau County*, 184 F.R.D. 497, 504 (E.D.N.Y. 1999) (conditioning a

vacatur of default on the payment of attorneys' fees and costs associated with the motion

practice arising out of the default); *see also* FED. R. CIV. P. 60(b) ("court may relieve a party . . . from a final judgment" on "just terms").

Aside from the further unnecessary delay and costs that would arise, plaintiffs will not be prejudiced by allowing defendant another bite at the proverbial apple.  As the record indicates, the defendant knew the consequences of a possible alter ego adjudication, but chose to hide behind a corporate name change to escape liability, thereby allowing the plaintiff and the Court to entertain and decide the motion for default judgment.  This was a conscious litigation tactic on the part of the defendant.  Nevertheless, given the preference for deciding cases on the merits, plaintiffs and the Court may be better suited by permitting this case to proceed, thereby removing at least one issue from the appeal that will inevitably be filed.

In sum, although the willfulness of defendants' conduct is clear, that willfulness does not outweigh the fact that defendants have put forth an arguably meritorious defense and there will be no substantial prejudice to plaintiffs were the default to be vacated.  Accordingly, I recommend that the Court deny plaintiffs' motion insofar as it seeks to hold Sunrise liable for the default judgment against its alter ego E-Z Supply, and that the Court formally vacate the default judgment against E-Z Supply, contingent on the payment to plaintiffs of all fees and costs related to the default judgment.

IV.    <u>Plaintiffs Are Entitled to Summary Judgment on Sunrise's Counterclaims</u>

Plaintiffs argue that defendant's counterclaims should be dismissed for lack of subject matter jurisdiction or alternatively, that they are entitled to summary judgment. (Docket Entry 62.)  Plaintiff further alleges that defendant's fourth counterclaim should be dismissed because plaintiffs are not a "labor organization" within the meaning of the statute.

20

A.      Sunrise's Counterclaims Are Permissive

The Federal Rules of Civil Procedure permit two types of counterclaims: compulsory and permissive. FED. R. CIV. P. 13.  A compulsory counterclaim is "any claim . . . the pleader has against an opposing party" that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim," and any non-compulsory counterclaim is by definition permissive. FED. R. CIV. P. 13.  In the Second Circuit, the transaction or occurrence test is met when:

> there is a "logical relationship" between the counterclaim and the main claim. Although the "logical relationship" test does not require an absolute identity of factual background, the *essential facts of the claims* must be so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.

*Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004) (emphasis added, and internal citation, quotation marks and brackets omitted).

Defendant's first three counterclaims are permissive. Whereas plaintiffs' claims center on defendant's compensation practices and alleged retaliation, defendant's first three counterclaims do not relate at all to any of these issues.  Rather, the counterclaims focus on discrete allegations of the common law tort claims of trespass to property, tortious interference with contract, and defamation.  The essential facts and elements of these claims are so different that judicial economy and fairness would not be served by allowing the claims to be resolved together.

The only arguable relationship between the claims is a *sine qua non* relationship. However, a "mere *sine qua non* relationship is insufficient to satisfy the required nexus which gives rise to a compulsory counterclaim." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 812 (2d Cir. 1979).  In any event, defendant did not allege *any* factual or legal connection between the two set of claims exists.  Accordingly, because counterclaims one, two and three do

21

not arise from the same transaction or occurrence as plaintiffs' claims, I now turn to whether they fall within the Court's supplemental jurisdiction.

B.   Defendant's Counterclaims Do Not Fall Within the Court's Supplemental Jurisdiction

Congress conferred supplemental jurisdiction on federal district courts to adjudicate "all other claims" in a civil action "that are so related to claims in the action within such original jurisdiction that they form part of the *same case or controversy* under Article III of the United States Constitution." 28 U.S.C. § 1367(a) (emphasis added).

A claim is "part of the same case or controversy" when it shares "a common nucleus of operative facts" with the claim that conferred jurisdiction to the court. *City of Chi. v. Int'l College of Surgeons*, 522 U.S. 156, 165 (1997) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966)); *Gibbs*, 383 U.S. at 725; *Cicio v. Does*, 321 F.3d 83, 97 (2d Cir. 2003).  In making this determination, the Second Circuit has "traditionally asked whether the facts underlying the federal and state claims substantially overlapped . . . [or] the federal claim necessarily brought the facts underlying the state claim before the court." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000)).

Defendant's first three counterclaims bear no relationship to the plaintiffs' claims.  None of the events alleged in defendant's three common law counterclaims are relevant to plaintiffs' wage or retaliation claims*. See Bu ex Rel. Bu v. Benenson*, 181 F. Supp. 2d 247, 254 (S.D.N.Y. 2001) (claims were not part of the same case or controversy where state law claims "involve[d] different rights, different interests, and different underlying facts").  The facts underlying defendant's counterclaims do not overlap in any degree with plaintiffs' claims, nor do plaintiffs'

22

claims bring the facts underlying the state claims before the Court.  Moreover, the three common

law tort counterclaims involve different rights and interests than the plaintiffs' wage and

retaliation claims.  Therefore, defendant's counterclaims do not arise from "a common nucleus

of operative facts" as plaintiffs' claims and thus are not subject to the Court's supplemental

jurisdiction.

Accordingly, I respectfully recommend that defendant's first three counterclaims be

dismissed for lack of jurisdiction.

C.    Even If the Court Had Subject Matter Jurisdiction, Defendant Has Failed to Meet
      Its Burden of Production

Even if, for the sake of argument, the Court has subject matter jurisdiction over the

counterclaims, plaintiffs are entitled to summary judgment over the counterclaims.  Plaintiffs, as

the moving party, bear the initial burden of showing that there is no genuine issue of material

facts; however, because the defendant bears the burden of proof at trial, plaintiffs have satisfied

their burden by pointing out that the record is devoid of any evidence to support the defendant's

case. *See Celotex Corp.*, 477 U.S. at 322-23; (Docket Entry 62.)  Defendant is then obligated to

come forward with specific facts and evidence to support each element of its claim. *See Burt*

*Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).  Defendant has

failed to meet that burden.  The only counterclaim that defendant submitted any evidence to

support is the defamation claim and only by providing the Court with copies of flyers that are

allegedly defamatory. (Docket Entry 64.)  However, in no way does the defendant establish that

the flyers 1) contained false statements; 2) were published without privilege or authorization to a

third party; 3) constituted fault as judged by, at a minimum, a negligence standard; and 4) caused

either special harm or constitute defamation *per se*.  *See Salvatore v. Kumar*, 845 N.Y.S.2d 384,

23

388 (citing *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1999)).  Defendant also submitted a

letter that plaintiffs allegedly published and distributed; however, defendant has not submitted

any evidence to establish that the letter was in fact published or distributed by or to anyone.

(Docket Entry 5 Ex. A.)  It is well settled that mere allegations alone are insufficient to defeat a

motion for summary judgment.

Defendant further cites to a number of depositions in its memorandum of law to support

its tortious interference claim. (Docket Entry 64.)  However, none of the relevant portions of the

depositions have been included in the defendant's extensive exhibits.[4] (Def. Mem. in Opp'n, Ex.

J, L, R.)

Due to the defendant's complete failure to come forth with any specific evidence to

support each element of its counterclaims, defendant has failed to meet its burden of production

and summary judgment should be granted on counterclaims one, two and three.

D.       Defendant's Fourth Counterclaim

Defendant's fourth counterclaim alleges that the plaintiffs and third party defendants

"were motivated by a desire to break the laws of the United States" by attempting to enlist

Sunrise to violate the Immigration and Naturalization Act, and only brought this action with the

intent to use the Court "as an engine of fraud to achieve [that] unlawful object." (Docket Entry 5

¶¶ 35-36.)  I am unaware of such a cause of action.  However, defendant discusses a Labor

Management Relations Act ("LMRA") section 303 claim in opposition to summary judgment.  It

is unclear whether the section 303 claim is a new counterclaim or whether defendant meant its

fourth counterclaim to constitute the section 303 claim.  Because "it is inappropriate [for parties]

to raise new claims for the first time in submissions in opposition to summary judgment," the

---

[4]    This is true in spite of the Court's request for a complete copy of exhibits from the defendant.

Court will interpret the fourth counterclaim as arising under LMRA section 303. *Beckman v. United States Postal Serv.,* 79 F. Supp. 2d 394, 407 (S.D.N.Y.2000).

Sunrise has no basis to allege a section 303 claim against the plaintiffs.  Section 303 of the LMRA, 29 U.S.C. 187, provides that:

> (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any *labor organization* to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.
>
> (b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefore in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, shall recover the damages by him sustained and cost of the suit.

Labor Management Relations Act § 303, 29 U.S.C. 187 (2008) (emphasis added).  The LMRA further defines a "labor organization" as "any *organization of any kind*, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." Labor Management Relations Act § 501, 29 U.S.C. 142 (2008); National Labor Relations Act § 101, 29 U.S.C. 152 (2008) (emphasis added).

As the plain language of the statute indicates, section 303 of the LMRA extends liability only to labor organizations for unfair labor practices.  Plaintiffs are individual, former employees of the defendant.  Since none of the plaintiffs (either individually or collectively) constitute a "labor organization" within the meaning of the statute, the counterclaim must be dismissed.[5]

---

[5]   Defendant's supposed "cross claims" against the third party defendants were presumably brought pursuant to Federal Rule of Civil Procedure 13(h) which allows a party to join a non-party to its counterclaims or crossclaims.  As a formality, I note that the defendant mislabeled his claims against the third party defendants.  The third party defendants were not (and are not) defendant's co-parties in this action.  Thus, the claims do not constitute "cross

## CONCLUSION

For the foregoing reasons, I respectfully recommend that plaintiffs' motion for summary judgment be granted in part and denied in part, resulting in the following outcome: (1) Sunrise should be estopped from relitigating the issue of alter ego; (2) the default against E-Z Supply should be vacated, contingent upon the payment to plaintiff of all fees and costs related to the default judgment; (3) all of Sunrise's counterclaims should be dismissed; and (4) the claims against the third party defendants should be dismissed without prejudice.

Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Chambers of the Honorable Sandra L. Townes within ten business days of receiving this Report and Recommendation.  Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

**Dated: March 2, 2009**
**Brooklyn, New York**


*Ramon E. Reyes, Jr.*

**Ramon E. Reyes, Jr.**
**United States Magistrate Judge**

---

claims." *See* FED. R. CIV. P. 13(g).  More importantly, however, defendant joined the third party defendants to this action via its counterclaims against the plaintiffs.  Sunrise no longer has any viable counterclaims against plaintiffs.  Therefore, there is no longer a basis for the joinder.  Accordingly, I recommend that the "cross claims" against the third party defendants be dismissed without prejudice to the bringing of such claims in a separate action.  My recommendation in this regard is also based on the fact that I question whether proper service was effectuated on these proposed third party defendants.